UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL SMORYNSKI,

                Movant,

v.

UNITED STATES OF AMERICA,

                Respondent.

_____/

Criminal Case No. 09-20213-2
Civil Case No. 14-13181

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

**ORDER DENYING MOVANT'S MOTION TO VACATE, SET ASIDE, OR CORRECT
SENTENCE [246]; DENYING MOVANT A CERTIFICATE OF APPEALABILITY;
AND DENYING MOVANT'S MOTION FOR DISCOVERY AND EVIDENTIARY
HEARING [274]**

On June 22, 2010, a jury convicted Movant of five counts of healthcare

fraud and one count of conspiracy to commit healthcare fraud, in violation of

18 U.S.C. § 1347 and 18 U.S.C. § 1349, respectively.  Movant filed several post-

trial motions, alleging, inter alia, that his counsel had rendered ineffective

assistance.  On October 22, 2010, the Court issued an Order [Dkt. #180] denying

Movant's post-trial motions.  On December 14, 2010, the Court sentenced Movant

to nine years (108 months) of imprisonment.  The Sixth Circuit affirmed Movant's

convictions and sentence on November 5, 2012.  *United States v. Smorynski*, No.

10-2681 (6th Cir. Nov. 5, 2012).

Movant filed a Motion to Vacate, Set Aside, or Correct Sentence [246] on August 15, 2014.  On order of the Court, the government filed a Response [264] on December 4, 2014.  Movant filed a Reply [272] on January 26, 2015, followed by an Amended Reply [273] on February 5, 2015.  On June 24, 2015, Movant filed a Supplemental Brief [292].  On September 21, 2015, Movant filed a Second Supplemental Brief [296].  On March 2, 2016, Movant filed a Revised Appendix to his Amended Reply [303].

On February 23, 2015, Movant filed a Motion for Discovery and Evidentiary Hearing [274].  On April 7, 2015, the government filed a Response [280] to Movant's discovery motion.  Movant filed a Reply [285] in support of his discovery motion on April 23, 2015.

For the reasons stated below, Movant's Motion to Vacate, Set Aside, or Correct Sentence [246] is **DENIED**.  Movant is **DENIED** a certificate of appealability.  Movant's Motion for Discovery and Evidentiary Hearing [274] is also **DENIED**.

## FACTUAL BACKGROUND

Movant and his co-defendant Bernice Brown were convicted of carrying out Medicare fraud through Wayne County Therapeutic (WCT), of which Movant was the vice-president and Brown was the president.  The government accurately summarized the evidence presented at trial as follows:

## 1. The Physical and Occupational Therapy Contractor Scheme

### A. Regulatory Framework

The government called Kelly Hartung to testify about Medicare rules for billing for physical, occupational, and psychotherapy services. Tr. 57; *see also* Gov't Tr. Exs. 1A-1F.3 She testified that Medicare pays for services provided to a Medicare beneficiary only by a person or clinic enrolled with Medicare. Tr. 63-64, 129. To enroll with Medicare as a provider of outpatient physical or occupational therapy, an occupational or physical therapist must be registered in the state. Tr. 135. Registered occupational therapists are called "OTRs" and registered physical therapists are called "RPTs." Hartung testified that if an OTR or RPT does not perform or supervise the therapy, Medicare will not pay for the services. Tr. 103, 106-107. The whole point of the system is to ensure that a licensed and enrolled Medicare provider is either performing or directly supervising the therapy provided. Tr. 136.

### B. WCT Therapists

During the period of the alleged conspiracy, October 2002 to September 2006, WCT employed a number of OTRs and RPTs who were enrolled with Medicare, among them Dana McDade (OTR), Desmond Rice (OTR), and Hamad Hamad (RPT). Tr. 264. McDade, Rice, and Hamad each had individual provider numbers with Medicare, under WCT's group number. Tr. 75-77. McDade and Rice both testified at trial. Tr. 260-297, 576-664. McDade and Rice explained that WCT staff assisted in processing and submitting their claims to Medicare. Tr. 266-67, 513-516. Numerous witnesses, including McDade, Marc Riley (a biller), and Tamika Taylor (Smorynski's assistant), testified that Smorynski oversaw WCT's Medicare billing operations. Tr. 405, 516, 537-38, 770-72, 817, 1057-58, 1098-99.

Hartung testified, and the supporting Medicare documents showed, that McDade, Rice, and Hamad each reassigned all of their benefits (e.g., payments) from Medicare to WCT. Tr. 74-77, 131, 267-69, 305, 584-85, 958; *see also, e.g.*, Gov't Tr. Ex 2C. WCT submitted bills to Medicare on behalf of McDade, Rice, and Hamad electronically, and Medicare paid the claims through direct deposit into WCT's bank account. Numerous witnesses testified and documentation established that Brown controlled the WCT bank account. *See, e.g.*, Gov't Tr. Ex. 202A; Tr. 406, 694, 733, 741-42.

Therefore, payment for any "therapy" services provided by McDade, Rice, or Hamad went directly to Brown.

Although McDade, Rice, and Hamad were registered therapists, McDade, Rice, and other WCT staff testified that the three therapists actually performed very little therapy at WCT. In fact, by 2005, the three performed almost no therapy themselves. Tr. 174. McDade and Rice each testified that Brown instructed them to simply "co-sign" the files of other people who were not licensed therapists and/or who were not enrolled with Medicare. Tr. 270, 272, 308, 604-09, 750-52. WCT then billed Medicare for the therapy as if McDade, Rice, and Hamad had performed the therapy themselves. Tr. 107, 420-21, 608-10, 739-42, 750.

### C. The Contractors

Beginning in October 2002, WCT contracted with three companies, Universal Rehab Services, Inc. (Universal), M&M Management, Inc. (M&M), and Lords Physical Therapy and Rehab Services, Inc. (Lords) (collectively the Contractors). Gov't Tr. Exs. 3-5. Brown signed the contracts on behalf of WCT. WCT entered into a contract with Lords in October 2002, with Universal in November 2004, and with M&M in July 2005. Tr. 165-166, 407-10, 415, 588-94. Each of the Contractors employed one physical therapist and one occupational therapist. Of the six Contractor therapists, only half were licensed, and none were enrolled with Medicare. Tr. 160-61, 588, 603-04.

The Contractors operated in similar fashion. Pradeep Pillai, as well as a number of beneficiaries, testified about how the Contractors operated. They bribed patients to sign fictitious forms, indicating they had received physical or occupational therapy and created fictitious "initial evaluations," "progress notes," and "discharge summaries" to supposedly document the therapy. Tr. 162, 173, 177, 198-99. They used those forms to create patient charts that appeared to document therapy. Tr. 159, 162, 172-73, 213-14, 229, 239-241, 249-50.

Paul Smith, Henderson Butler, and Norris Moore, Jr. testified about receiving cash kickbacks to sign forms indicating that they had received therapy, which never occurred. Tr. 213, 239-241, 249-250; *see also* Tr. 175. The government introduced photographs showing M&M's owner paying cash to him for signing the fictitious forms. Tr. 218, Gov't Tr. Ex. 39.

Because none of the Contractors were enrolled with Medicare, they sold the fictitious therapy files to WCT. Pillai testified that Brown told him not to worry about not being enrolled with Medicare because she would have her staff sign the files. Tr. 159, 163-164, 194-95, 307, 523-25. Pillai testified that he was instructed not to sign any initial evaluations. Tr. 175.

### D. The Fraud

Taylor and McDade testified that when WCT received the patient files and billing paperwork from the Contractors, the patient files was sent to WCT therapists and the billing paperwork went to the billing department. Tr. 417. With respect to the patient files, McDade, Rice, and Brown herself testified that Brown instructed McDade, Rice, and Hamad to "co-sign" the files, which meant that they signed each initial evaluation, progress note, and discharge summary. Tr. 163-64, 167, 174-79, 271-72, 585-86, 596-604, 659, 798-99. Because the Contractors never signed the initial evaluations or discharge summaries, the WCT staff therapist's signature was the only one on those documents. Tr. 174-79, 279-280, 739-41, 749-51. The files made it appear to any outside observer that the WCT staff therapist (McDade, Rice, or Hamad) had performed the initial evaluation and discharge summary for the patient. *See* Gov't Tr. Exs. 9-15, 17, Tr. 174, 298, 701-02, 732, 739-41, 749-51. Typically, Brown paid McDade, Rice, and Hamad $10 per signature. Tr. 270, 304, 308, 418-421, 588, 1140. McDade and Rice both testified that they never performed any work, and that their signatures signified nothing more than the $10 payment from Brown. Tr. 276, 283-284.

Multiple witnesses testified that Brown and Smorynksi knew that Rice and Hamad only worked an hour or two every other week at WCT. *See, e.g.*, Tr. 274-275, 418-419. They had full time jobs elsewhere. Tr. 262-63, 274-75, 418-419, 448, 580, 1043. Yet they signed for 200, 500, and at times, 1000, visits in a single session, which typically lasted less than an hour, and involved doing nothing more than signing paperwork to the point where their hands hurt. Tr. 273-274, 417. Brown knew how many files they were signing because she was paying them per signature. Tr. 275. Rice testified that he told Brown that he was uncomfortable signing evaluation and discharges for patients who he had never seen or supervised. Tr. 274, 279. Brown told him to just keep signing the files. Tr. 279.

Smorynski also knew what the therapists were doing. Tr. 275-76, 282, 304-08, 418, 449. Taylor testified that Smorynski routinely witnessed both Rice and Hamad signing large stacks of files without even reviewing the pages. Tr. 418. Rice testified that Smorynski, upon seeing him signing a stack of files, told him that he had "the easiest job in the world." Tr. 275-276. Special Agent Bartnik also testified that when he interviewed Smorynski, he admitted that WCT staff had done nothing to check to see if the therapy had been performed, let alone performed the therapy themselves. Tr. 308.

In addition to the sheer volume of visits submitted by the Contractors, the dates of service reflected in the files made it impossible for McDade, Rice, or Hamad to supervise, let alone perform, the services. That is because, in many cases, the files were so "old" that the patient had purportedly been discharged months before WCT even received the file. Tr. 618-21. McDade, Rice, and Hamad could not have performed or supervised therapy that had long since occurred. Marc Riley testified that Brown and Smorynski were aware of the staleness of the files because Medicare often imposed a 10% payment penalty on WCT for very old claims. Tr. 516, 521. Smorynski authored a memorandum about this very problem. Gov't Tr. Ex. 26.

For all the therapy visits reflected in the files that the Contractors had sold to WCT, the witnesses uniformly testified that McDade, Rice, and Hamad never met the patient, never spoke to the patient over the phone, never spoke to the contractor therapist who had supposedly provided the service about the patient, and had no idea if the therapy had been performed at all. Tr. 174, 179, 216, 241-242, 278, 282-283, 577. WCT therapists did not perform the services or supervise the services reflected in the Contractors' files. Tr. 167, 175-176, 178, 180, 217-218, 241-242, 250, 283.

Meanwhile, the billing paperwork was sent to WCT's billing department, where it was used to submit claims to Medicare. Tr. 511-22. At the direction of Brown and under the guidance of Smorynski, the claims were submitted, under the provider numbers of McDade, Rice, and Hamad. Tr. 302-03, 511-22, 527, 608-10, 739-42. By causing the claims to be submitted to Medicare, Defendants represented that McDade, Rice, and Hamad had performed the services or supervised the services, when they knew that that was not true. Tr. 107, 750.

. . .

## 2. The Social Work Scheme

Taylor, Renee Watson, and Riley testified that Brown restructured the entire WCT staff to begin performing psychotherapy or, as she termed it, "social work" for WCT patients after Medicare imposed a cap on physical and occupational therapy reimbursements in January 2006. Tr. 330-31, 356, 425-427, 529-30, 625-26, 719-20. Numerous internal WCT documents—many either handwritten or initialed by Brown herself—corroborated their testimony. *See, e.g.*, Gov't Tr. Exs. 102-111. For a short time, WCT was forced to lay off some of its staff members and cut the salaries of several others. Tr. 303, 425. Brown had authorized a contemporaneous memorandum warning, "All jobs were on the line because of the cap." Tr. 1070.

Taylor, Watson, and Riley testified that Brown told her staff that WCT's current physical and occupational therapy clients must be "depressed" because they were not receiving as much therapy due to the cap. Tr. 334-35, 357-58, 367. The witnesses testified that Smorynski drafted petitions for the patients to sign, demanding repeal of the cap, and drafted letters to Congress, purportedly on behalf of the patients, also demanding repeal of the cap. Tr. 335, 339, 342-43, 429, 432-35. Smorynski also drafted a script that WCT staff was supposed to read to patients over the phone regarding the cap, WCT's lobbying effort, and the fact that WCT would bill Medicare for its lobbying efforts. Tr. 335-40, 343-46, 350, 354, 427-30, 432-34, 460, 532-35.

Taylor, Watson, and Riley testified that, at a meeting on February 13, 2006, Brown gave specific instructions to her staff on how to bill for their new work. Tr. 435. She distributed a memorandum and a sample billing sheet with precise instructions. Gov't Tr. Exs. 103C-D; Tr. 350-351, 437. All patients were to be diagnosed with "depression." Tr. 350-54, 357-39, 367, 437-38, 442, 531-32. Brown wrote that "the only billable code for social work is 311 for depression." Gov't Tr. Exs. 103C-D. Brown instructed the WCT staff that the initial telephone call, during which they were instructed to read from the script prepared by Smorynski, was to be billed using a code 90801, which stood for individual psychotherapy evaluation. Tr. 350-54, 357-59, 361-62, 367, 389, 437-430, 460, 532-35. All subsequent phone calls, time spent writing the letters to Congress, and other time spent on the process, should by billed using

a code 90806, which signified a 45-50 minute face-to-face psychotherapy session with the client. Tr. 350-354, 361-62, 437-40. But rather than face-to-face meetings, Brown instructed her staff to make only phone calls, and that "permission" from management was required to see a patient. Tr. 345-46, 349-353, 440.

The persons Brown selected to actually perform the social work "evaluations" and "meetings" were a motley collection of billers, drivers, unlicensed and licensed occupational therapists, and administrative assistants. Tr. 430. Brown told those "social workers" that they were to create notes, but that the one licensed social worker on staff, Joanne Smith-Washington, would "co-sign" their notes. Tr. 348-49, 359-63, 367-68, 440-441, 445-46, 756-57. Smith-Washington did not meet with or speak to the patients, or the persons supposedly performing the "therapy." Tr. 349, 359-360, 363, 365, 398. Smith-Washington also did not supervise the persons supposedly performing "therapy." Tr. 360. Watson testified that Brown informed her to leave the signature on the initial evaluation, which she had prepared, blank, so Smith-Washington could sign it, because otherwise Medicare would not pay. Tr. 360, 363. Brown directed Smith-Washington to sign all of the patient notes—making it look like Smith-Washington had performed the social work services. Tr. 348-49, 359-63, 367-68, 440-41, 445-46, 756-57. All of the reimbursements from Medicare were paid into the WCT bank account, which Brown controlled. Tr. 756.4

Rita Perry and Bettye Everson, two Medicare beneficiaries, testified that they never received the services billed by WCT to Medicare on their behalf. Tr. 396-401, 487-494. Medicare actually sent a letter to Smorynski demanding an accounting. Tr. 759-62, 1057. But rather than come clean, Brown and Smorynski, knowing that Perry never received any therapy, submitted false paperwork to Medicare and actually "re-billed" Medicare for services supposedly provided to her. Tr. 759-62. Defendants' own witness, Melyssa Byrd, admitted on cross-examination that she had no idea that WCT had billed Medicare for psychotherapy, and denied ever receiving such services from WCT. Tr. 856. Yet WCT billed Medicare fifteen times for psychotherapy "treatments" and maintained a false file to document such services. Gov't Tr. Exs. 119-121.

### MOTION FOR DISCOVERY AND EVIDENTIARY HEARING

The Court may authorize a party to conduct discovery in support of a motion under 28 U.S.C. § 2255 for "good cause."  Rules Governing § 2255 Proceedings, Rule 6, 28 U.S.C.A. foll. § 2255.  The good cause requirement bars "fishing expeditions based on a petitioner's conclusory allegations."  *Cornwell v. Bradshaw*, 559 F.3d 398, 410 (6th Cir. 2009) (quoting *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004)).  The movant must "present[] specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate."  *Id.* (quoting *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001)).

Movant has not shown good cause for the discovery he requests.  He simply gestures to the arguments presented by the government in its Response and asserts that his requested discovery is necessary to rebut those arguments.  His request appears to be a "fishing expedition" based on a conclusory allegation that the requested discovery would be helpful.

Movant's request for an evidentiary hearing likewise does not describe the evidence to be presented or explain the need for it.  In requesting a hearing, Movant merely states his belief that he needs to appear personally in court to rebut the government's arguments.  For the reasons explained below, "the files and records of the case conclusively show that [Movant] is not entitled to relief."  *Ross*

*v. United States*, 339 F.3d 483, 490 (6th Cir. 2003).  The Court therefore need not hold an evidentiary hearing.  *Id.*

Accordingly, Movant's Motion for Discovery and Evidentiary Hearing [274] is denied.

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE

To succeed on a motion to vacate, set aside, or correct sentence, a movant must allege "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).  Movant alleges a violation of his constitutional right to the effective assistance of counsel.  To establish ineffective assistance of counsel, Movant must show that his counsel rendered deficient performance and thereby prejudiced Movant's defense so as to render the outcome of the proceedings unreliable.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Movant raises many challenges to his counsel's performance.  None, however, meet the *Strickland* standard.

## I.    Failure to advance Movant's interpretation of Medicare regulations

Movant faults his counsel for failing to advance Movant's interpretation of Medicare regulations.  As Movant interprets the regulations, they permitted WCT

to bill Medicare for therapy not personally performed or directly supervised by its therapists, since its therapists were not in private practice and did not have individual provider numbers.  Movant argues that his counsel should have advanced his interpretation in various ways, including presenting certain "critical exculpatory proofs," proposing a jury instruction on the defense's theory of the case, and retaining a Medicare expert to testify.

On direct appeal, however, the Sixth Circuit rejected Movant's interpretation, stating that "the regulations required WCT's registered therapists to perform or directly supervise therapy that was billed to Medicare."  Accordingly, the Sixth Circuit held that evidence that Movant "knew that WCT's therapists did not provide any services or supervision regarding some of the billings" and instead "merely signed the files that were prepared by other contractors" sufficed to support his convictions.

Movant's counsel did not render deficient performance or prejudice Movant's defense by failing to advance an interpretation of Medicare regulations rejected by the Sixth Circuit.

## II.    Failure to move for a continuance

On May 12, 2010, Movant made an oral motion to terminate his representation by attorney Lawrence Bunting.  The same day, the Court granted the motion by oral order and entered an Order Appointing Federal Defender [87].  On

June 1, 2010, attorney Thomas Warshaw filed an appearance on Movant's behalf and represented him at a motion hearing. During the hearing, the Court asked Warshaw if he needed anything to prepare for trial, which was scheduled to begin on June 8, 2010 (one week later). Warshaw responded that he did not need anything. Trial began one week later, as scheduled. Movant argues that Warshaw did not have adequate time to prepare for trial, and thus rendered ineffective assistance by failing to move for a continuance.

"Not every restriction on counsel's time or opportunity . . . to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983) (citing *Chambers v. Maroney*, 399 U.S. 42, 53–54 (1970)). Trial judges are afforded "a great deal of latitude in scheduling trials," partly due to the difficulty of "assembling the witnesses, lawyers, and jurors at the same place at the same time." *Id.* Accordingly, "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Id.* at 11–12 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)) (internal quotation marks omitted). Applying these principles, the Supreme Court found no constitutional violation where a defendant was assigned new counsel only six days before trial, relying on the fact that the defendant's new counsel reviewed the files prepared by his predecessor, met with the defendant, and represented to the court that he was prepared for trial. *Id.* at 12.

12 of 24

Similarly, the Sixth Circuit has held that a trial court acted within its discretion by denying a motion for continuance filed by counsel who appeared only eight days before trial, since the defendant "made no specific showing of prejudice" and his new counsel "presumably had access to the fruits of [predecessor] counsel's earlier preparation efforts." *United States v. Martin*, 740 F.2d 1352, 1360–61 (6th Cir. 1984).

Movant has not explained how Warshaw was so hamstrung by his seven-day trial preparation period as to render a denial of a continuance, if he had requested one, "unreasoning and arbitrary." *Morris*, 461 U.S. at 11. The Court concludes that Warshaw was afforded sufficient trial preparation time to safeguard Movant's right to counsel.

### III.   Failure to successfully move for a bill of particulars

Attorney Lawrence Bunting filed a Motion for Bill of Particulars [72] on Movant's behalf on April 2, 2010. The government filed a Response [75] on April 22, 2010. The Court held hearings on the motion on May 12, 2010, and June 1, 2010. At the second hearing, Movant's new counsel, Thomas Warshaw, represented that the government had provided sufficient evidence and notice to prepare Movant for trial. The Court accordingly denied the motion as moot. The Sixth Circuit did not address the denial of the motion on appeal. However, the Sixth Circuit noted co-defendant Brown's argument that she lacked notice of what

"was being charged, including, what evidence, witnesses, and what the witnesses were going to testify to in court." The Sixth Circuit found this "undeveloped" argument unpersuasive because "Brown was properly charged by indictment" and because there was "no indication that the prosecution withheld evidence from her."

Movant faults his counsel for failing to convince the Court to grant his motion for a bill of particulars. However, Movant was charged in the same indictment found by the Sixth Circuit to properly charge Brown. Movant provides no reason to believe that the government withheld evidence from him, particularly in light of the fact that the Sixth Circuit found no sign that it withheld evidence from Brown. Movant has made no showing that his counsel rendered deficient performance by conceding that a bill of particulars was not necessary, or that doing so prejudiced his defense.

## IV.    Failure to move for severance

Multiple charges against the same defendant may be tried together if the charged offenses are of "similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." *United States v. Medlock*, 792 F.3d 700, 711 (6th Cir. 2015) (quoting FED. R. CRIM. P. 8(a))). Charges against multiple defendants may be tried together if the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." *Id.*

(quoting FED. R. CRIM. P. 8(a)). "Under Rule 8(b), defendants who are indicted together, ordinarily should be tried together." *United States v. Gardiner*, 463 F.3d 445, 472 (6th Cir. 2006) (quoting *United States v. Breinig*, 70 F.3d 850, 852 (6th Cir. 1995)) (internal quotation marks and brackets omitted). A defendant moving to sever his trial from that of a co-defendant "must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *Id.* (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)). The mere fact that the government has stronger evidence against the co-defendant than against the moving defendant, or that the moving defendant would have a greater chance of acquittal if tried separately, does not establish sufficient prejudice. *Id.* (citing *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)).

Movant faults his counsel for failing to move to sever Movant's trial from co-defendant Brown's trial. However, Movant and co-defendant Brown were properly tried together because they were accused of participating in the same fraudulent scheme, through the same company, in the same time period. Movant also faults his counsel for failing to move to sever the charges concerning fraudulent billing for occupational and physical therapy from the charges concerning fraudulent billing for psychotherapy. The offenses underlying these charges, however, were properly tried together because they constituted parts of a common scheme or plan. Moreover, Movant has identified no reason to believe

that counsel, if he moved for severance, could have convinced the Court that failing to grant the motion would result in compelling, specific, and actual prejudice. Thus, Movant has made no showing that his counsel's failure to file a motion for severance constituted deficient performance or prejudiced his defense.

## V.   Failure to insist on thorough hearing of co-defendant's motion to suppress

Movant's co-defendant Brown filed a Motion to Suppress [85] on April 27, 2010. The government filed a Response [80] on May 6, 2010. The Court denied the motion at the conclusion of a hearing held on June 1, 2010. The Sixth Circuit affirmed the denial of the motion.

Movant faults his counsel for failing "to have the Court hold a thorough hearing on all of the issues raised in Brown's suppression motion." Movant does not explain why he believes the Court's consideration of the motion was insufficiently thorough. Nor does he identify cause to believe that a more thorough hearing would likely have resulted in the motion being granted. Movant has therefore failed to make a showing of deficient performance or prejudice.

## VI.   Failure to move for a ruling on the end date of the fraud

In its case in chief, the government introduced evidence that postdated September 13, 2006—the date government officers searched WCT offices pursuant to a warrant. On June 15, 2010, government counsel raised objections, which the

Court sustained, on some defense evidence that postdated September 13, 2006.

Movant believes that the Court applied a double standard in prohibiting the defense

from admitting evidence that postdated September 13, 2006, while allowing the

government to admit such evidence.  He faults his counsel for failing to challenge

this alleged double standard via motion for a ruling on "the end date of the fraud."

This argument appears to be based on a misconception.  The Court did not

exclude any evidence on June 15, 2010, on the grounds that the evidence postdated

September 13, 2006, or postdated "the end date of the fraud."  It is true that the

preparation of certain evidence after September 13, 2006, factored into the Court's

decision to exclude that evidence as inadmissible hearsay.  The date established

that the records were prepared after Movant and his co-defendant knew, as a result

of the government search on that date, that they were at risk of prosecution—

allowing government counsel to argue that the records were prepared in

anticipation of prosecution rather than in the ordinary course of business, and thus

did not fall under the business records exception to the hearsay rule.  In sustaining

the government's hearsay objections, which relied in part on the timing of the

search, the Court did not categorically prohibit the defense from admitting

evidence postdating the search.  The Court therefore did not apply a double

standard by allowing the government to admit evidence postdating the search.

Movant has identified no legitimate grounds for the motion he argues counsel should have filed.

## VII.   Failure to defend certain defense exhibits against government objections

On June 15, 2010, the Court addressed the admissibility of numerous defense exhibits.  Government counsel objected to some exhibits.  Counsel for co-defendant Brown responded to the objections, but Movant's counsel did not separately respond.  The Court sustained the government's objections to some of the exhibits.

Movant faults his counsel for failing to defend the excluded exhibits.  He does not explain how his counsel should have supplemented the responses from co-defendant Brown's counsel.  He has therefore failed to show deficient performance.

## VIII.  Failure to challenge Agent Bartnik's testimony about Movant's out-of-court statements

At trial, the government called Darren Bartnik, a special agent of the United States Department of Health and Human Services, to testify.  Bartnik testified that he interviewed Movant while participating in the investigation of WCT's fraud.  He testified regarding several statements Movant made during this interview, including Movant's alleged admission that he knew that only services provided or directly supervised by a licensed therapist met Medicare's billing requirements.

Movant faults his counsel for failing to challenge testimony concerning this statement, among others.  Movant claims the testimony was false and constituted hearsay.

Movant's counsel did challenge this testimony; when government counsel first asked Bartnik what Movant said about his responsibilities at WCT, Movant's counsel raised a hearsay objection.  Government counsel responded that Movant's out-of-court statements were admissible as "party admissions."  *See* Fed. R. Evid. 801(d)(2) (providing that a statement offered against an opposing party and made by that party in an individual or representative capacity is not hearsay).  The Court overruled the hearsay objection raised by Movant's counsel.

Movant has not identified any viable grounds for excluding this testimony, and has therefore failed to show that his counsel's failure to successfully challenge the testimony rendered his performance deficient or prejudiced Movant's defense.

## IX.    Failure to introduce McDade memoranda

Movant faults his counsel for failing to introduce into evidence multiple memoranda written by Dana McDade, purportedly showing that she directed the fraud.  Movant emphasizes that many of the memoranda do not state that copies were delivered to Movant, arguing that the memoranda thus show that he was unaware of McDade's fraudulent activities.  However, the fact that the memoranda do not explicitly indicate that they were provided to Movant does not prove that

Movant did not see the memoranda.  More importantly, even if Movant did not see the memoranda, he could be aware of the facts discussed in them.  There was sufficient evidence at trial to prove that Movant was aware of and participated in the fraud.  Movant has not explained how these memoranda contradict that evidence.  Thus, Movant has not shown that omission of these memoranda rendered counsel's performance deficient or prejudiced his defense.

## X.     Failure to secure presence of certain witnesses

Movant faults his counsel for failing to "check to make sure that Defense witnesses were properly subpoenaed" and for failing to move for a continuance when it became known that certain witnesses would not appear for trial.  Movant says nothing about the witnesses and their potential testimony, aside from mentioning that Margaret Rider was a "senior biller" and that Doris Johnson was involved in "file and billing preparation."  Even assuming that these witnesses would have appeared at trial absent counsel's deficient performance, Movant's failure to explain how these witnesses would have bolstered his defense precludes him from showing prejudice.

## XI.    Failure to make adequate opening statement

Movant faults his counsel for making an inadequate opening statement, and for declining to make any opening statement at all until Movant insisted that he do so after the close of the government's evidence.  "[T]he decision to forgo an

opening statement entirely is ordinarily a mere matter of trial tactics and will not constitute a claim of ineffective assistance of counsel." *Jackson v. Houk*, 687 F.3d 723, 741 (6th Cir. 2012) (quoting *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004)) (internal quotation marks and ellipses omitted).  Movant provides no reason to believe that his counsel's decision to forego an opening statement did not fall within this general rule.

## XII.   Failure to make adequate closing statement

Movant faults his counsel for failing to clarify, in his closing statement, that Movant was neither the "head biller" nor a Medicare expert.  But Movant's counsel did challenge the government's characterization of Movant as the head biller in his closing argument: counsel noted that no witness described Movant as the head biller and faulted the government for relying on a single memorandum out of thousands that were likely exchanged by WCT employees.  Counsel also argued that Movant played no real role in WCT's affairs.  Movant does not explain why his counsel needed to present *further* argument concerning Movant's lack of involvement in billing.  Nor does he explain the need to emphasize Movant's  lack of expertise in Medicare regulations; the billing violations at issue were not so complex as to be unrecognizable without expertise.  Accordingly, Movant has not shown that these omissions from closing argument rendered counsel's performance deficient or prejudiced Movant's defense.

## XIII.  Failure to object to jury instruction on deliberate ignorance

Movant faults his counsel for failing to object to the manner in which the Court instructed the jury on deliberate ignorance.  Co-defendant Brown challenged the propriety of the Court's instruction on direct appeal.  The Sixth Circuit held that the Court "acted within its discretion by giving an instruction that closely tracks Sixth Circuit Pattern Jury Instruction 2.09."  Movant therefore cannot show that his counsel's failure to object to the instruction rendered his performance deficient or prejudiced Movant's defense.

## XIV.  Failure to propose additional jury instructions

Movant faults his counsel for failing to propose jury instructions in addition to those the Court delivered.  Movant identifies several Sixth Circuit Pattern Jury Instructions that he believes competent counsel would have proposed.  He offers no argument regarding most of the additional instructions, which the Court will therefore not address.

Movant only attempts to develop an argument concerning pattern jury instructions 7.03 and 7.03A, which advise jurors that they need not accept a witness's opinion and that they should consider "the witness's qualifications and how he reached his conclusions" in evaluating the weight to give opinion testimony.  However, Movant identifies no opinion testimony that likely influenced the jury's verdict.  Nor does he attempt to explain why the jurors may

have weighed that testimony differently—so as to undermine confidence in the verdict—if they had been differently instructed.  The Court instructed the jurors that they could disbelieve any testimony provided by a witness.  The Court further instructed them that they should use common sense in determining what additional factors to consider when evaluating a witness's testimony.  Even assuming that Movant's counsel rendered deficient performance by failing to propose additional instructions similar to pattern jury instructions 7.03 and 7.03A, Movant has made no plausible claim of prejudice.

## XV.   Cumulative effect of errors

Errors that are insufficiently prejudicial, when considered in isolation, to violate a defendant's rights "may cumulatively produce a trial setting that is fundamentally unfair."  *United States v. Dado*, 759 F.3d 550, 563 (6th Cir. 2014) (quoting *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007)).  Thus, "examining an ineffective assistance of counsel claim requires the court to consider 'the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case.'"  *Id.* (quoting *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006)).

As explained above, Movant has failed to show that the majority of his counsel's alleged errors constituted deficient performance.  The Court has declined to rule on the deficient performance issue with respect to certain alleged errors,

including counsel's failure to secure the presence of certain witnesses and to propose Sixth Circuit pattern jury instructions on opinion testimony. Even assuming that these alleged errors constituted deficient performance, their cumulative effect does not undermine the Court's confidence in the verdict, in light of the totality of the evidence in the case.

## CONCLUSION

For the reasons stated above, the Court concludes that neither discovery nor an evidentiary hearing is necessary to reject Movant's claim that his constitutional right to the effective assistance of counsel was violated. For the same reasons, the Court concludes that Movant has failed to make a substantial showing of the denial of a constitutional right. Thus, the Court will deny Movant a certificate of appealability. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Accordingly,

**IT IS ORDERED** that Movant's Motion to Vacate, Set Aside, or Correct Sentence [246] is **DENIED**. Movant is **DENIED** a certificate of appealability.

**IT IS FURTHER ORDERED** that Movant's Motion for Discovery and Evidentiary Hearing [274] is **DENIED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: May 20, 2016

24 of 24